IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

JEREMIAH D. JOHNSON,

      Plaintiff,

v.                                    CASE NO. 2:08-cv-0290

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

**M E M O R A N D U M  O P I N I O N**

    This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This case is presently pending before the court on briefs in support of judgment on the pleadings. Both parties have consented in writing to a decision by the United States Magistrate Judge.

    Plaintiff, Jeremiah D. Johnson (hereinafter referred to as "Claimant"), filed an application for DIB on January 13, 2006, alleging disability as of October 17, 2005, due to cardio myopathy, sleep apnea, growth hormone deficiency, pain and cramping in both legs, pain and numbness in wrists and hands, pain in muscles and joints. (Tr. at 15, 87, 93, 129, 145.) The claim was denied initially and upon reconsideration. (Tr. at 15, 26-29, 35-37.) On December 27, 2006, Claimant requested a hearing before an

Administrative Law Judge ("ALJ").  (Tr. at 38.)  The hearing was held on May 30, 2007 and December 4, 2007 before the Honorable John Murdock.  (Tr. at 44, 57, 358-84, 385-404.)  By decision dated December 13, 2007, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 15-23.)  The ALJ's decision became the final decision of the Commissioner on April 8, 2008, when the Appeals Council denied Claimant's request for review.  (Tr. at 6-9.)  On May 2, 2008, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 404.1520(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers

2

from a severe impairment.  Id. § 404.1520(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. § 404.1520(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at

17.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of idiopathic non-ischemic cardiomyopathy, a pain and fatigue syndrome of unknown etiology, and obesity.  (Tr. at 17-18.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 18-19.) The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations.  (Tr. at 19-20.)  As a result, Claimant cannot return to his past relevant work.  (Tr. at 21.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as machine packer, laundry folder, and office helper which exist in significant numbers in the national economy.  (Tr. at 22-23.)  On this basis, benefits were denied. (Tr. at 23.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting

4

Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was thirty-three years old at the time of the administrative hearing. (Tr. at 389.) Claimant is a high school graduate. (Tr. at 389.) He attended regular education classes. (Tr. at 236.) In the past, he worked as a grocery store stocker and steel mill mechanic. (Tr. at 389-91.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

Physical Evidence

On July 11, 2004, Vinod Sanghi, M.D. wrote: "The patient complains of tiredness, numbness in hands and feet, weight gain of 20 pounds in six months, shortness of breath, constipation, and a history of sleep apnea...The patient may have growth hormone

deficiency." (Tr. at 161.) Records indicate on June 30, 2004, July 29, 2004, and September 13, 2004, Claimant had lab work completed at Dr. Sanghi's request. The reports are largely illegible and without explanation. (Tr. at 158-59, 162-65.)

On August 13, 2004, Dr. Sanghi filled out a form titled "Physician's Statement of Medical Necessity for Adult Growth Hormone Treatment." In the section of the form stating Clinical Impression, the following is written: "32 year old male with fatigue, sleep apnea and very low GF-1 level in need of growth hormone replacement therapy." (Tr. at 160.)

On November 12, 2004, Claimant underwent an MRI of the lumbar spine. John Finger, M.D., a radiologist, reported:

> The AP alignment appears normal...There is no evidence of acute fracture or dislocation. There is no evidence of diskogenic disease, central canal stenosis or neural foraminal narrowing at any level. The surrounding soft tissues are unremarkable.
> Impression: 1. Diffuse low signal identified throughout the entire lumbar spine and vertebral bodies. This may be a normal variant; however, a lymphoproliferative disorder cannot be excluded. Clinical correlation is advised. 2. No evidence for diskogenic disease, central stenosis or neural foraminal narrowing. 3. No evidence for acute traumatic or infectious process.

(Tr. at 170-71.)

On November 17, 2004, Ali M. Dagner, M.D., a rheumatologist, wrote to Mayada Aziz, M.D.:

> Thank you for referring Mr. Johnson. This is a 31-year-old presenting with myalgias and fatigue for the past five years. The patient was diagnosed with sleep apnea and is currently on CPAP. His sleep improved but the symptoms of fatigue did not. He seems to tire quickly

and the weakness seems to be more pronounced in the lower extremities, especially where it is associated with the myalgias. The symptoms are worse distally. In the upper extremities he reports mostly tingling and this happens with certain activities such as driving or using a hammer, etc. He does complain of some tingling in the feet in the morning...There is no history of diabetes or thyroid disorder and he has no history of anemia. There is no family history of neuropathy. His past medical history is significant for "growth hormone deficiency" for which he is getting replacement therapy as well as sleep apnea...

Physical exam reveals an overweight man. W. 270. H. 5'10". He has no active rash. The head and neck exam are unremarkable. There is no adenopathy. Lungs were clear. The heart was regular and rhythmic. The abdomen was unremarkable. He has full range of movement in the joints and no synovitis. The neurologic examination shows mild bilateral quad weakness. The DTRs were symmetrical.

I reviewed his workup, the ESR and CRP were normal. The CPK was mildly elevated on two occasions, the most recent reading was 239. The CBC was normal. The ANA was negative. The acetylcholine receptor binding antibody was negative. The lead level was normal. Hb A1C was normal as well. His serum calcium was 9.2 and magnesium 2.0. The EMG/NCS study did not show evidence of carpal tunnel, but however he does have evidence of bilateral S1 radiculopathy most pronounced on the left. I followed that up with an MRI study of the lumbosacral spine, there is no evidence of herniated disc but there is diffuse low signal throughout the lumbar spine and vertebral bodies. According to the radiologist, a lymphoproliferative disorder could not be ruled out...

Impression: 1. Mildly elevated CPK, etiology unclear.
2. Bilateral S1 radiculopathy.
3. Abnormal bone signal on spine MRI, etiology unclear.

Recommendations: A bone scan was ordered today. I recommend follow-up with oncology. If lymphoma is ruled out, then I think further evaluation by neurology is needed to confirm the presence of radiculopathy and explain the significance.

(Tr. at 166-67.)

On November 23, 2004, Reza Abghari, M.D., radiologist,

reported to Dr. Dagner regarding the bone scan: "Impression: Normal whole body bone scan including single photon emission computed tomography of the lumbosacral region besides slight increased activity in the medial compartment of both knees, predominantly in the tibial plateau, likely due to arthritic and degenerative disease or trauma." (Tr. at 169.)

Records indicate Claimant was treated by Parvez Khan, M.D. from December 16, 2004 to December 20, 2005. (Tr. at 192-203.) Notes dated March 28, 2005 state: "The patient had a normal CBC, CMP, LDH, serum and urine protein electrophoresis. The patient also had CT scan of chest, abdomen and pelvis which were normal except for some fatty infiltration of the liver. The patient is obese." (Tr. at 192.)

On December 8, 2005, records indicate Claimant underwent a left heart catheterization and coronary angiogram at Oakwood Hospital. (Tr. at 176-91.) Cheng-Chong Lee, M.D. wrote:

> In summary, the patient appeared to have a non-ischemic cardiomyopathy with mild to moderately impaired left ventricular systolic function. I think that this time, the patient should be managed medically consisting of Coreg 6.25 twice a day, Lisinopril 10 mg, salt restriction, vitamin supplement, weight reduction and continue physical conditioning.

(Tr. at 178.)

Records indicate Claimant was treated by Dr. Lee from October 17, 2005 to March 13, 2006. The notes are handwritten and largely illegible. (Tr. at 204-209.)

Records indicate Claimant was treated by Mayada Aziz, M.D. on October 11, 2005, January 10, 2006, June 15, 2006, and July 13, 2006 for complaints of dizziness, palpitation, cardiomyopathy, sleep apnea, fatigue, impaired glucose tolerance, dyspnea, and radiculopathy pain in the lower extremities. (Tr. at 218-234.)

On May 16, 2006, a State agency medical source completed a Physical Residual Functional Capacity Assessment ("PRFCA") and opined that Claimant could perform light work with the only postural limitations being that he could only occasionally climb ramp/stairs/ladder/rope/scaffolds. Claimant had no manipulative, visual, or communicative limitations. Claimant's only environmental limitations were to avoid extreme temperatures and hazards. (Tr. at 210-17.) The evaluator, Byong-Du Choi, M.D. noted: "Lungs consistently clear. H/O [history of] non-ischemic cardiomyopathy. Coronary angiogram negative (12/05). Ejection fraction 35-40%. Chest pain denied in 1/06. Mild bilat quad weakness noted + radiculopathy in lower extremities, but neuro intact. EMG negative for CTS." (Tr. at 212.)

On July 26, 2006, Elmer L. Nagye, P.A.-C. [Physician Assistant-Certified], Ansted Medical Clinic, reported that Claimant was there "to establish as a new patient. Patient states he needs referral to a cardiologist. Patient has a history of cardiomyopathy diagnosed in October of 2005. He also has a history of growth hormone deficiency and sleep apnea... Past surgical

history includes heart catheterization in 2005." (Tr. at 255.)

On August 9, 2006, Ganpat G. Thakker, M.D., an internal medicine and cardiovascular diseases specialist (Tr. at 281), advised Elmer Nagye, PAC that his plan was to "repeat EKG and Echo doppler." (Tr. at 239.) On that same date, Dr. Thakker reviewed the results of Claimant's echocardiogram and made this conclusion: "1. Mild bi-atrial and right ventricular enlargement. 2. Non-dilated, non-hypertrophic left ventricle and ejection fraction of 55%. 3. Doppler parameters do not indicate elevated left ventricular filling pressure. 4. Pulmonary artery systolic pressure is likely to be at upper normal range with trace tricuspid regurgitation." (Tr. at 241.)

On August 16, 2006, Dr. Thakker reviewed Claimant's echo doppler results and made this assessment: "Echo reveals normal LV ejection fraction... Mr. Johnson is informed of his echo doppler results, need to start an exercise program and lose weight." (Tr. at 242.)

On August 21, 2006, Mr. Nagye evaluated Claimant and reported: "The patient is being seen for a cardiomyopathy. He is now complaining of depression and hand and arm numbness... Refer the patient to a neurologist for EMG. That appointment was made. The patient was advised that an appointment for mental health evaluation would be made. The patient is refusing medications for treatment of depression at this time." (Tr. at 253-54.)

10

On September 12, 2006, Joe Othman, M.D., neurologist, provided a report to Elmer Nagye, PAC stating that "The EMG and NCS of both upper extremities revealed significant prolongation of the median motor and sensory latencies consistent with mild bilateral carpal tunnel syndrome, both sides are equally affected." (Tr. at 245.)

On September 18, 2006, Mr. Nagye evaluated Claimant and stated: "The patient states that he is requesting a new cardiologist. The patient was seen by Dr. Thakker in Charleston. The patient states that he was not satisfied... Patient also needing a request for a physical for Department of Human Services. Based on the lateness of the afternoon the patient was advised that we would schedule that appointment for September 21st." (Tr. at 252.)

On September 21, 2006, Mr. Nagye evaluated Claimant and reported that Claimant is

> here for examination ordered by the Department of Human Services. The patient has a history of cardiomyopathy, shortness of breath, hand and finger numbness. This has been secondary to carpal tunnel syndrome diagnosed on September 12, 2006. He also has a history of low back pain... 1. At this time the patient was not cleared for any type of work. 2. We will continue his present mediation, his Coreg 12. 5 mg b.i.d., lisinpril 20 mg q.d., Cymbalta 60 mg q.d., Ditropan 0.6 mg q.d. injections, patient self-administers. Will continue the baby aspirin 81 mg, continue his multivitamin. 3. The patient was advised to follow up with his cardiologist as ordered. 4. He is to continue his exercise program and weight loss. 5. Will follow-up with the patient at his next regularly scheduled appointment.

(Tr. at 250-51.)

11

On September 21, 2006, Mr. Nagye provided a "Medical Assessment of Ability to Do Work-Related Activities (Physical)" form. (Tr. at 246-49.) He indicated Claimant's lifting, carrying, standing/walking and sitting were affected by his impairment. He noted Claimant could lift and/or carry 40 pounds, could stand/walk for a total of 2 hours in an 8-hour work day and without interruption for 2 hours; and sit for a total of 20 minutes in an 8-hour work day. He found that Claimant could never climb, balance or crawl and could occasionally stoop, crouch, and kneel. (Tr. at 246-47.) He found that Claimant's reaching and feeling were affected by the impairment but not his handling, pushing/pulling, seeing, hearing or speaking. (Tr. at 248.) He concluded that Claimant's environmental restrictions were heights, moving machinery, and vibration. Claimant did not have restrictions regarding temperature extremes, chemicals, dust, noise, fumes, and humidity. (Tr. at 248.) He stated that the medical findings supporting this assessment were "cardiomyopathy, fibromyalgia, growth hormone deficiency - all causing muscle and joint pain, [not legible], fatigue and weakness. (Tr. at 249.) The assessment, which is signed on the line entitled "Physician's Signature" by Mr. Nagye, has an undated signature on the last page, which is purportedly that of Wesley Olson, M.D. (Tr. at 249.)

On October 10, 2006, Claimant was seen at Summersville Memorial Hospital Emergency Room ("ER") for chest pain. He was not

admitted but was evaluated, then sent home in "stable" condition. (Tr. at 295-96.)

On October 16, 2006, Thair Barghouthi, M.D. evaluated Claimant stating: "He saw Dr. Thakker in Charleston once.  He wants to establish cardiology FU with me."  (Tr. at 288.)

On October 20, 2006, Claimant underwent a brain MRI with and without contrast upon referral from Mr. Nagye due to Claimant's reported headaches and dizziness.  Cruz Halberto of the Radiology Department at Summersville Memorial Hospital reported: "There are no intracranial signal abnormalities demonstrated to suggest infarct or bleeding.  No contrast enhancing lesions appreciated. The brain stem is normal.  The ventricles are also normal with no midline shift or mass effects.   Impression: Essentially unremarkable MRI of the brain with and without contrast."  (Tr. at 256.)

On October 30, 2006, Dr. Barghouthi performed a stress test on Claimant.  He noted: "Normal perfusion.  EF 47%."  (Tr. at 291.) On October 30, 2006, Claimant also underwent a cardiolite treadmill stress test.  Dr. Barghouthi noted in a November 2, 2006 report:

    Myocardial Persusion Scan: Normal
    Gated Study: Mild Global Hypokinesis.  EF 47%.
    CTMST 10/20/06
    Mildly impaired exercise tolerance. (09 : 11 minutes).
    Appropriate hemodynamic response to exercise.
    No stress induced chest pain.
    No stress induced arrythmias.
    Negative for ischemia by EKG criteria.

(Tr. at 294.)

On November 22, 2006, Mr. Nagye of the Ansted Medical Clinic wrote:

> This is a 33-year-old white male here being treated for chronic pain.  The patient states that Mobic is not working at this time.  He has had pain in the upper legs for the past two weeks.  The patient is also requesting referral for repair of carpal tunnel syndrome.  The patient does have a history of cardiomyopathy and hypertension and it is well controlled at this time... We'll run an Epstein Barr test to eliminate a viral component to his pain... MRI's of the head have not indicated any mass lesions that could possibly cause the pain.

(Tr. at 299.)

On December 4, 2006, a State agency medical source completed a Physical Residual Functional Capacity Assessment ("PRFCA") and opined that Claimant could perform light work with the postural limitation that he could never climb ladder/rope/scaffolds, could occasionally climb ramp/stairs, balance, stoop, kneel, crouch, and crawl.  Claimant was unlimited in manipulative limitations except for a limitation in feeling (skin receptors).  Claimant had no visual or communicative limitations.  Claimant had no environmental limitations except to avoid concentrated exposure to extreme cold and fumes, etc. (Tr. at 273-80.)   The evaluator, Regelio Lim, M.D., an internal medicine and cardiovascular diseases specialist (Tr. at 282), noted:

> non-ischemic cardiomyopathy mild last 12-005 with ejection fraction of 40 percent but the last echocardiogram revealed that the ejection fraction return to normal of 55 percent normal being 55 to 70 percent .normal adl.  The allegations not fully credible.  The cardiomyopathy resolved as of 8-006 with normal ejection

14

fraction.   Cardiac cath revealed no occlusion.   Sleep
apnea, fibromyalgia.

(Tr. at 278.)   Also, in response to the question: "are there

treating/examining   source   conclusions   about   the   claimant's

limitations or restrictions which are significantly different from

your   findings?"   Dr.   Lim   checked   "Yes"   and   provided   this

explanation:

> 9/21/06: (ansted medical) Function form - unsteady gait,
> loss   of   balance   DX   -   cardiomyopathy,   fibromyalgia,
> fatigue,   joint   pain.   Normal   neuro.   The   last
> echocardiogram   revealed   return   to   normal   55   percent,
> normal being 55 to 70 percent last 8-09-006.   Fatigue not
> due to heart because ejection fraction back to normal of
> 55 percent.   Last report gait normal.   Last 10-20-006
> normal MRI of the brain.

(Tr. at 279.)

> On December 19, 2006, Mr. Nagye evaluated Claimant:
>
> Patient   is   requesting   check   for   spot   on   his   back.
> Patient is also complaining of pain in his upper legs,
> this has been ongoing problem for approximately three
> weeks.   Several   medications   including   NSAID's   and
> narcotics   have   been   tried.   Labs   do   not   indicate   an
> organic   cause   for   the   pain   at   this   time...Plan   is   to
> refer the patient back to Wilson for biopsy of the skin
> lesion.   Patient will be referred to a rheumatologist for
> evaluation of the upper leg pain...Patient was advised
> that   his   pain   would   not   be   treated   with   narcotics.
> States he understands.   Will follow up with the patient
> after referral to the rheumatologist.

(Tr. at 298.)

> On January 24, 2007, Mr. Nagye evaluated Claimant:
>
> Here   for   a   follow   up.   Results   of   ultrasound,   of   the
> upper extremities.   Patient also requesting an order for
> a  C  PAP  machine,  he  has  been  diagnosed  with  sleep
> apnea...Patient was advised that ultrasound of the venous
> side   of   the   circulatory   system   showed   no   evidence   of

15

> DVT's or other blood flow abnormalities... Refer the
> patient to a neurologist for evaluation of the pain.  I
> will also order a new mask and head gear for C PAP
> machine, that order was placed.

(Tr. at 297.)

On January 31, 2007, Wassim Saikali, M.D., a rheumatologist,

wrote to Mr. Nagye that he had evaluated Claimant and made these

findings:

> Atypical joint pain.  Muscle pain in the leg.  Most of
> the symptoms are from the hips down the aspect of the
> knee.  I do not see any evidence of swelling or
> synovitis.  I do not think he has fibromyalgia, could
> have restless leg syndrome, however, I am not sure that
> I have an accurate diagnosis.  I believe that he has been
> having symptoms since 2000.  Several physicians have seen
> him and he did not come with a diagnosis.  MRI was normal
> at one time, the other one repeated by Dr. Dagher....At
> this time I feel that he may have restless leg syndrome
> and we can give him Requip but if that does not help him,
> unfortunately, I do not have a lot of things to offer
> him.  He needs to follow up with a neurologist for
> further evaluation.  The MRI might need to be repeated
> because at one time the MRI was read as abnormal.
> Consider lympoproliferative disorder.

(Tr. at 300.)

On March 27, 2007, Kiren Kresa-Reahl, a neurologist, wrote to

Mr. Nagye that she had evaluated Claimant and made these findings:

> Symptoms of myopathy/myositis, but so far with a negative
> work-up by Rheumatology, including CK, and with negative
> imaging of the spine.
>
> Discussion/Plan: I will have the patient sign a records
> release, to get the records from his rheumatologist in
> Michigan, particularly all of his blood work.  I will
> order a follow-up EMG/NCV of the upper and lower
> extremities to be done here at CAMC, specifically asking
> the question of whether he has a myopathy to account for
> his symptoms (previously was directed at finding carpal
> tunnel syndrome and ulnar neuropathy)... A return

16

appointment will be scheduled in 2 months, or sooner should his lab work show any significant abnormalities requiring immediate intervention.

(Tr. at 303.)

On April 26, 2007, Jo Ann Allen Hornsby, M.D., Associate Professor, Section of Rheumatology, WVU Department of Medicine, wrote to A. Wesley Olson, M.D., regarding his referral of Claimant. Dr. Hornsby stated:

Unfortunately, I do not have any records available today. If Mr. Johnson, indeed, has persistently elevated Dks and an elevated EMG and normal thyroid function or other obvious explanation, then I think your next workup would be a muscle biopsy. I will go ahead and have him get his records and review those, and if those suggest a need, he can have a muscle biopsy here. He says he prefers that I just go ahead and order that as soon as possible. I will see him back on an as-needed basis.

(Tr. at 283-84.)

On April 30, 2007, Dr. Barghouthi evaluated Claimant at a six month follow-up. He noted:

Active with fair effort tolerance limited with generalized arthritis (FU Dr. Hornsby, Morgantown) and neuropathy (FU Dr. Reahl, Charleston). No chest pain. No orthopnea, PND or edema. No significant palpitations. Sleep apnea, CPAP adjusted recently after a sleep study. Past Medical History:
Myocardial infarction: negative
Coronary angioplasty: negative
CABG surgery: negative
No major surgeries....
Diagnosis: Cardiomyopathy PRI: 425.4 Ischemic. Stable. Sleep apnea OT/Unspecified: 780.57 Obesity Unspecified: 278.00. Plan: Same RX. FU [follow up] 8 months.

(Tr. at 285-87.)

On June 15, 2007, Paola Pergami, M.D., a neurologist,

17

evaluated Claimant at the request of Dr. Hornsby.  (Tr. at 304-07.)

In a letter to Dr. Hornsby, Dr. Pergami wrote:

> The patient has had extensive evaluation by his neurologist in Charleston, including an EMG that was unremarkable.  B12, TSH, anti-acetylcholine receptor antibodies, ANA, and workup for vasculitis were all unremarkable.  The disease is not progressive, but the patient is off work. He has been on disability since two years ago when he had myocarditis, which was probably related to a viral infection.  The patient reported his ejection fraction was 35 and has improved back to 47... His neurological examination is essentially unremarkable. He only has a little bit of giveaway weakness at the [illegible] bilaterally, but this is mostly related to pain.  He can do multiple repetitions without fatigue. [illegible] nerves are intact.  Reflexes are 2+ and symmetric.  Toes are downgoing.  His sensory examination is normal... We are going to repeat an EMG here at WVU. We are checking the CK, aldolase, and LFTs.  After the EMG is done, depending on the results, we will discuss the possibility of a muscle biopsy.

(Tr. at 306.)

On July 18, 2007, Kip Beard, M.D. evaluated Claimant in a consultative internal medicine examination for the West Virginia Disability Determination Service.  (Tr. at 308-13.)   Dr. Beard examined Claimant and did a review of Claimant's medical records. He wrote these conclusions in a July 25, 2007 report:

> Impression:
> 1.   Idiopathic, nonischemic cardiomyopathy, stable.
> 2.   Chronic low back pain.
> 3.   Growth hormone deficiency according to history and records.
> 4.   Sleep apnea, according to history and records...
>
> The claimant is a 34-year-old male with history of cardiomyopathy after presenting with shortness of breath in 2005.  According to the records from 2005, the claimant was noted to have severely diminished left ventricular systolic dysfunction with diminished ejection

18

fraction.   The etiology of the cardiomyopathy was not
determined.  He was started on medications.  Studies were
negative for any evidence of myocardial ischemia.  He, in
follow-up studies, did have improvement of his ejection
fraction into the upper 40-percent range and there was
actually  one  echocardiogram  that  showed  normalized
ejection fraction of 55 percent in 2006.  Regarding the
heart, the claimant does complain of some dyspnea but
complains that his leg pain would stop him before his
dyspnea.   He describes no heart failure symptoms of
orthopnea  or  edema  and  denies  chest  pain  or  cardiac
palpitations.  Heart exam today is unremarkable.

Not listed under the allegations but mentioned during the
history part of the examination was that of back and leg
pain.  This is reflected within the medical records.  MRI
of the back did not reveal any evidence of significant
disk disease  or  evidence  of  nerve  root  impingement.
Examination reveals the claimant ambulating normally.
The claimant's back exam revealed some mild pain with
tenderness  but  preserved  range  of  motion.    Lower
extremity reflexes were symmetric.  There was no evidence
of lumbar radiculopathy.

(Tr. at 313.)

On July 18, 2007, Dr. Beard also completed a "Medical Source
Statement of Ability to do Work-Related Activities (Physical)"
form. (Tr. at 314-19.)  He found Claimant could frequently lift
and/or carry up to 10 pounds, occasionally lift and/or carry 11 to
50 pounds, and never lift and/or carry 51-100 pounds.  (Tr. at
314.) He found Claimant could sit at one time without interruption
for four hours, stand at one time without interruption for two
hours, and walk at one time without interruption for one hour. (Tr.
at 315.)  He found Claimant could sit for a total of eight hours in
an eight hour work day, stand for a total of six hours in an eight
hour work day, and walk for a total of four hours in an eight hour

work day.  (Tr. at 315.)  He noted that Claimant did not require
the use of a cane to ambulate.  (Tr. at 315.)  He found regarding
Claimant's use of his hands, that he could frequently use both
hands to reach overhead and in all other directions, and could
continuously do handling, fingering, and feeling, and could
occasionally push/pull.  (Tr. at 316.)  He noted that Claimant's
left hand was dominant.  (Tr. at 316.)  He found Claimant could
frequently do the activity of operation of foot controls using both
the right foot and the left foot.  (Tr. at 316.)  He concluded that
Claimant could occasionally climb stairs/ramps/ladders/scaffolds,
frequently stoop, kneel, crouch, crawl, and continuously balance.
(Tr. at 317.)  He did not evaluate Claimant's hearing or vision.
(Tr. at 317.)  Regarding environmental limitations, he found
Claimant could frequently tolerate exposure to unprotected heights,
moving mechanical parts, operating a motor vehicle, dust, odors,
fumes and pulmonary irritants, and vibrations.  He found Claimant
could occasionally be exposed to humidity, wetness, and extreme
temperatures.  (Tr. at 318.)  He also concluded Claimant could be
exposed to very loud noise with protections.  (Tr. at 318.)  He
concluded that Claimant had no activity limitations. (Tr. at 319.)

On August 7, 2007, Claimant underwent testing at the UHA Pain
Clinic in Morgantown, West Virginia.  The notes are handwritten and
largely illegible.  (Tr. at 321-26.)

On October 22, 2007, Mr. Nagye completed a Physical Residual

Functional Capacity Assessment ("PRFCA") of Claimant. (Tr. at 327-331.)  He concluded Claimant's lifting/carrying was limited to maximum occasionally of one hour at 40 pounds. (Tr. at 328.) Claimant's standing/walking was limited to two hours in an 8-hour work day, and 15 minutes without interruption.  (Tr. at 329.) His sitting was limited to 120 minutes in an 8-hour work day, and 30-40 minutes without interruption.  (Tr. at 329.)  They found Claimant could never climb or crawl, and could occasionally balance, stoop, crouch and kneel.  (Tr. at 329.)  He found Claimant's reaching and feeling were affected by his impairment.  (Tr. at 330.)  Claimant's environmental restrictions were to avoid heights, moving machinery, and vibration.  (Tr. at 330.)  The medical findings supporting this assessment were stated as: "Cardiomyopathy, fibromyalgia, growth hormone deficiency, muscle and joint pain, fatigue [illegible]." (Tr. at 331.)   The assessment, which is signed on the line entitled "Physician's Signature" by Mr. Nagye, has an undated signature on the last page, which is purportedly that of Wesley Olson, M.D.  (Tr. at 331.)

On November 19, 2007, Claimant was evaluated at the University of Virginia Health System upon referral by Mr. Nagye.  (Tr. at 332-55.)  Claimant's underwent significant testing.  Lab results for Hepatitis C Antibody; TSH W Reflex; Hepatitis B Core AB, IGM; Erythrocyte Sedimentation Rate (ESR); Magnesium (MG); Comprehensive Metabolic Chem Panel; Transferrin; C Reactive Protein (CRP);

Hepatitis B Surface Antibody; Anti Nuclear Antibody (ANA); Creatine
Kinase (CK); Aldolase, Serum; and Hepatitis B Surface Antigen show
claimant's results to be in the normal range or negative.  (Tr. at
342-55.)

On November 19, 2007, Angela Tubb, M.D., a rheumatologist at
University of Virginia, wrote to Mr. Nagye. Her letter states:

> We saw your patient...for evaluation of myalgias and
> weakness...By report initially he did have CK levels in
> the 200's. Previous workup in January 2007 included a
> normal CK level by report.  He has never had a muscle
> biopsy.  In September 2007 he had a negative Lyme test.
> CBC and CMP were normal.  In October of 2006 he had a
> normal brain MRI.  An L spine MRI in 2004 showed
> hypointense signal in the vertebral bodies with question
> of lyphoproliferative disorder.  He has followed by
> Neurology in West Virginia who have tested for multiple
> sclerosis which was negative by report.  EMG and nerve
> conduction studies have shown only bilateral carpal
> tunnel syndrome.  He does have a history of ulnar palsy
> which is resolved.  He saw Dr. Hornsby at WVU
> Rheumatology who did not give him a diagnosis due to
> negative tests. He also saw Dr. Saikali in Beckley, West
> Virginia in January 2007 who reported that he had normal
> labs and was not given a diagnosis.  These records were
> reviewed and are in the chart.
>
> Past Medical History: Cardiomyopathy in October of 2005.
> He was seen by multiple cardiologists who gave him a
> diagnosis of idiopathic cardiomyopathy... He has had
> carpal tunnel syndrome for two years, ulnar nerve palsy
> and obstructive sleep apnea.  Growth hormone deficiency
> was found during workup for his symptoms.  He took
> replacement for about one year which did not help so he
> stopped...
>
> It has been suggested in the past that this patient may
> have fibromyalgia syndrome, however, his clinical history
> and exam do not support this diagnosis.  His initial lab
> workup by us was unrevealing.  We will have him see our
> cardiologist for further investigation of the possible
> cause of his cardiomyopathy.  It is probable that his
> cardiomyopathy is related to his systemic myalgias.  We

will also consider consulting Dr. Ted Burns for a second
neurologic opinion.  He may need a muscle biopsy in the
future however we will investigate these other options
first.  Consideration needs to be given to ruling out
storage and infiltrative diseases.

(Tr. at 339-41.)

On December 4, 2007, Judith Brendemuehl, M.D., an impartial
medical expert, appeared and testified at a supplemental Social
Security Administration hearing regarding Claimant's medical
record.  (Tr. at 372-77.)

Psychiatric Evidence

On July 13, 2006, Hugh D. Bray, Ph. D., a licensed
psychologist, assessed Claimant for a State of Michigan Disability
Determination for the Social Security Administration.  (Tr. at 235-
38.) Dr. Bray reported:

General Observations: He came alone to the test center.
He was on time for the scheduled appointment...He came by
car.  His movements were fluid.  No gait or posture
problems were noted. He was appropriate in his manners...

Mental Status: Contact with reality was intact.  Self-
esteem was within normal limits.  Motor activity was
within normal limits.  He displays appropriate autonomy.
Motivation was appropriate.  He possesses insight.

Stream of Mental Activity: His mental activity was
organized...

Diagnostic Impression:
Axis 1: No diagnosis.
Axis 2: No diagnosis.
Axis 3: See medical reports of cardiomyopathy, sleep
apnea, and growth hormone deficiency.
Axis 4: Psychosocial stressors: Health issues, mild...
Competency to Manage Funds: This claimant is capable of
managing his funds in his own best interest.

23

(Tr. at 237-38.)

On July 29, 2006, a State agency medical source completed a Psychiatric Review Technique form.   (Tr. at 258-71.)   The evaluator, Dennis Beshara, M.D. found Claimant had no medically determinable psychiatric impairment.   (Tr. at 258.)

On December 1, 2006, a State agency medical source reviewed the Psychiatric Review Technique form completed on July 29, 2006. The evaluator, Holly Cloonan, Ph. D., a licensed psychologist, "reviewed all the evidence in file and the PRTF of 7/29/06 is affirmed as written."  (Tr. at 272.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ did not give great weight to the opinions of the treating physician, Elmer Nagye, P.A.-C. [Physician Assistant - Certified], under the supervision of Wesley Olsen, M.D. (Pl.'s Br. at 7-11.)

The Commissioner argues that the ALJ correctly declined to give controlling or significant weight to the September 2006 and October 2007 medical assessment forms completed by Mr. Nagye and approved by Dr. Olsen.  (Def.'s Br. at 12-19.)

Evaluating Opinions of Treating Sources

Claimant asserts that the ALJ erred "when he did not give great weight to the opinion and residual functional capacity assessment of the treating physician, Elmer Nagye, P.A.-C., under

24

the supervision of Wesley Olsen, M.D., without suitable explanation as to why this opinion was not given weight." (Pl.'s Br. at 2.) Specifically, Claimant argues that

> The ALJ does not have the power to discount the functional conclusions of examining or treating physicians on the basis that such conclusions are not supported by clinical findings because he does not "possess" any medical "expertise."...

> If controlling weight is not given, the regulations set forth a series of tests to determine how much weight will be given including the length of treatment relationship, nature and extent of treatment, supportability, consistency with other evidence and specialization. It is clear that the ALJ in this case did not perform the required series of tests specified by the regulations. No mention was made by the ALJ of the length of the treatment relationships, the extent of the treatment or specialization of the doctors providing opinions on functional capacity and no explanation as to why he found Dr. Olsen's opinion as stated in the medical assessment form "not consistent with the treatment record or other medical evidence of record."...

> Further, the ALJ incorrectly reported the claimant had been under their care since July, 2007, when the claimant had been a patient at the Ansted Medical Clinic since July 26, 2006. The claimant contends that the correct length of the treatment relationship has a bearing on the weight to be given to the opinion.

> The ALJ provides no explanation or medical evidence to support his findings that the claimant's cardiomyopathy and myalgia do not limit the claimant's ability to perform work activities on a sustained basis at either the light or sedentary exertional levels. The primary care providers reported that the claimant could not work an eight (8) hour day on a sustained basis.

(Pl.'s Br. at 8-10.)

The Commissioner responds that Claimant's assertions have no merit because the ALJ complied with the regulations when he weighed

25

the opinions of Mr. Nagye and Dr. Olsen.   Specifically, the
Commissioner argues:

> First, the medical records from Ansted Medical Clinic
> contradict Plaintiff's representation about the amount of
> involvement Dr. Olsen had with completing these two
> medical assessments and with the amount of direct care he
> provided for Plaintiff...Mr. Nagye completed both forms
> and Dr. Olsen only signed off on the forms. This is
> evidenced by the fact that the handwriting on the forms
> is consistent with Mr. Nagye's handwriting and the second
> signature at the bottom of the forms attributed to Dr.
> Olsen is inconsistent with the handwriting on the body of
> the form.  Therefore, it appears Dr. Olsen reviewed the
> forms that Mr. Nagye completed...
>
> Second...Plaintiff's statement that an ALJ cannot give
> less weight to the opinions of a medical source on the
> basis that such opinions are not supported by clinical
> findings is inconsistent with the Commissioner's
> regulations.
>
> Third...Here, the medical assessment forms were not
> entitled to controlling weight because the forms were not
> well-supported by medically acceptable clinical and
> laboratory diagnostic techniques.  For example, both
> assessments limited Plaintiff to carrying forty pounds
> for no more than one hour per day (Tr. 246, 328).
> However, when asked to identify what medical findings
> supported this conclusion, Mr. Nagye and Dr. Olsen left
> this area of the form blank (Tr. 246, 328.)
> Additionally, Mr. Nagye's treatment notes, which do not
> appear to have been signed off on by Dr. Olsen, are
> inconsistent with such a finding.  Mr. Nagye's clinical
> examinations revealed that Plaintiff had a full range of
> motion in his upper extremities...Additionally, treatment
> notes consistently show that Plaintiff had a steady gait
> and normal muscle strength, normal range of motion, and
> no neurological deficits in his lower extremities that
> would interfere with his ability to stand or walk...
> Additionally, Mr. Nagye's treatment notes contain no
> objective clinical findings documenting that Plaintiff
> ever exhibited any difficulty sitting... Mr. Nagye's
> treatment notes consistently found that Plaintiff had a
> steady gait and never documented that Plaintiff
> experienced a loss of balance (Tr. 250, 252-53, 255, 297-
> 99.)... Finally, and most significantly, is Mr. Nagye's

26

and Dr. Olsen's statement that Plaintiff's alleged symptoms were attributable to fibromyalgia (Tr. 249, 331). This statement is completely undermined by the statements of two examining neurologists, Drs. Suikali and Tubb, both of whom found that Plaintiff did not have fibromyalgia (Tr. 300, 341). Therefore, Mr. Nagye's and Dr. Olsen's medical assessment forms were entirely unsupported by medically acceptable clinical and laboratory diagnostic techniques.

Mr. Nagye's and Dr. Olsen's medical assessment forms were also inconsistent with the other substantial evidence of record. As stated above, two neurologists found Plaintiff did not have fibromyalgia (Tr. 300, 341). Regarding his ability to lift, reach, and feel, Dr. Hornsby found Plaintiff had normal 5/5 grip strength and muscle strength in his arms and legs (Tr. 283) and Dr. Beard found Plaintiff had no difficulty buttoning buttons, picking up coins, and writing (Tr. at 312). Regarding his ability to sit, stand, walk, lift, and carry, several examining physicians found Plaintiff had normal muscle strength (Tr. 283, 303, 312), normal deep tendon reflexes (Tr. 303, 312), a normal ability to walk (Tr. 303, 312), the ability to lift and/or carry ten pounds frequently and fifty pounds occasionally (Tr. 314), normal sensory perception (Tr. 286, 289, 304), normal coordination (Tr. 286, 289, 303), and that Plaintiff appeared comfortable while sitting down (Tr. 310). Therefore, Mr. Nagye's and Dr. Olsen's limitations in their medical assessments are inconsistent with the other substantial evidence of record and are not entitled to controlling weight...

While Mr. Nagye did have a treating relationship with Plaintiff, there is no objective evidence that Dr. Olsen ever personally examined Plaintiff. Regarding the length of the treating relationship and frequency of examination, Mr. Nagye only examined Plaintiff on seven occasions over a six-month period (Tr. 250-55, 297-99). Regarding the nature and extent of the treatment relationship, Mr. Nagye only performed general clinical examinations and did not perform any specialized testing (Tr. 250-55, 297-99). Regarding the supportability of Mr. Nagye's and Dr. Olsen's opinions and the consistency of those opinions with the other evidence of record, as stated above in detail, their opinions were not well supported by objective clinical or laboratory diagnostic evidence nor were they consistent with the other

substantial evidence of record.  Finally, regarding
specialization, Dr. Olsen was a primary care doctor and
Mr. Nagye was a physician's assistant.  Therefore, for
the reasons stated above, their opinions were not
entitled to any significant weight.

(Def.'s Br. at 12-18.)

In evaluating the opinions of treating sources, the
Commissioner generally must give more weight to the opinion of a
treating physician because the physician is often most able to
provide "a detailed, longitudinal picture" of a claimant's alleged
disability.  See 20 C.F.R. § 404.1527(d)(2) (2006).  Thus, a
treating physician's opinion is afforded "controlling weight only
if two conditions are met: (1) that it is supported by clinical and
laboratory diagnostic techniques and (2) that it is not
inconsistent with other substantial evidence." Ward v. Chater, 924
F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §
404.1527(d)(2) (2006).

The opinion of a treating physician must be weighed against
the record as a whole when determining eligibility for benefits.
20 C.F.R. §§ 404.1527(d)(2) (2006).  Ultimately, it is the
responsibility of the Commissioner, not the court to review the
case, make findings of fact, and resolve conflicts of evidence.
Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  However,
the court must not abdicate its duty to scrutinize the record as a
whole to determine whether the Commissioner's conclusions are
rational.  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

Under § 404.1527(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion.   Section 404.1527(d)(3), (4), and (5) adds the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."   § 404.1527(d)(2).

Under § 404.1527(d)(1), more weight generally is given to an examiner than to a non-examiner.   Section 404.1527(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). The Fourth Circuit Court of Appeals has held that "a non-examining physician's opinion cannot by itself, serve as substantial evidence supporting a denial of disability benefits when it is contradicted by all of the other evidence in the record." Martin v. Secretary of Health, Education and Welfare, 492 F.2d 905, 908 (4th Cir. 1974); Hayes v. Gardener, 376 F.2d 517, 520-21 (4th Cir. 1967). Thus, the opinion "of a non-examining physician can be relied upon

29

when it is consistent with the record." <u>Smith v. Schweiker</u>, 795
F.2d 343, 346 (4th Cir. 1986).

The undersigned has thoroughly reviewed all the medical
records, and finds that the ALJ fully and correctly considered Mr.
Nagye's and Dr. Olsen's opinions, as well as those of the
consultative examining physicians and the state agency record-
reviewing medical sources of record in determining Claimant's
physical status.  The undersigned further finds that contrary to
Claimant's assertions, the ALJ provided a thorough explanation as
to why Mr. Nagye's and Dr. Olsen's opinions were not given greater
weight.  In review, the ALJ found:

> The undersigned cannot give any particular weight to the
> opinions of the claimant's primary care providers at
> Ansted Medical Center, Elmer L. Nagye, P.A.-C, under the
> supervision of Wesley Olson, M.D. (Exhibit 27F (13F)).
> The claimant has been a patient at the clinic since July
> 2007 [sic; 2006].  He was followed almost monthly during
> the period of which treatment records were submitted.
> The limitations assessed, however, are not consistent
> with the treatment record or other medical evidence of
> record.  For example, the assessment states that the
> claimant has poor balance and an unsteady gait, while
> treatment notes report a steady gait.  Further, according
> to the treatment record, the claimant's cardiomyopathy
> and hypertension are well controlled. (Exhibits 13F and
> 21F).
>
> The undersigned gives significant weight to the opinions
> of the State agency medical consultants, who agreed that
> the claimant has the maximum exertional capacity for
> light work.  State agency medical consultants are highly
> qualified physicians, who are also experts in Social
> Security disability evaluation.  Their opinions in this
> case are consistent with the medical and other evidence.
> The undersigned, however, accepts the more conservative
> opinion on postural limitations and finds that avoidance
> of all exposure to vibration and extremes of heat and

cold is warranted.  But the undersigned does not accept any manipulative limitations.  (Exhibits 8F and 15F).

The undersigned accepts the opinion of the medical expert.  Dr. Brendemuehl opined that the claimant is reasonably limited to lifting and carrying 10 pounds frequently and 20 pounds occasionally because of pain, not due to loss of motor strength (Exhibit 24F, p. 3, et al.).  Dr. Brendemuehl pointed to the consistency of the claimant's complaints about muscle pain, particularly pain primarily in the proximal leg, worsened by increased physical activity, as for example, by lifting his son.

(Tr. at 21.)

While the Claimant is correct that the ALJ misstated that the claimant had been a patient at the Ansted Medical Clinic "since July 2007", the undersigned finds this was merely a typo.  The ALJ clearly made reference to Mr. Nagye's clinical notes at Exhibit 13F, which are dated from July 26, 2006. (Tr. at 250-55.) Therefore, the ALJ considered the correct length of the treatment relationship, which has a bearing on the weight to be given to the opinion.

Also, regarding Claimant's argument that the ALJ did not properly consider the affect of cardiomyopathy and myalgia on his ability to perform work activities on a sustained basis, the undersigned finds this assertion to be incorrect.  The record shows that the ALJ fully considered Claimant's testimony and the medical evidence regarding these conditions.  The ALJ found:

The medical evidence regarding the claimant's cardiac condition supports symptoms of the nature described, but not symptoms of the intensity, persistence and limiting effects alleged.  With medication therapy, the claimant's estimated left ejection fraction has improved over time.

31

An echocardiogram in August showed normal left ventricular wall motion and an estimated ejection fraction of 55 percent, 55 to 70 percent being normal (Exhibits 5F, 7F, 9F, 11F, 15F, p. 6, 19F). The claimant complains of dizziness when making postural changes, which is a side-effect of his cardiac medications. The claimant testified that he does not get dizzy just walking around.

The claimant reports constant myalgia, which has increased over the years. The claimant has undergone rheumatological and neurological evaluations by private physicians (Exhibits 22F, 23F) and at West Virginia University (Exhibit 28F). The claimant has most recently rated his muscle pain at 8 to 9 on a progressive scale of 0 to 10. Pain keeps him up at night. The claimant cannot exercise because activity increases his pain. He has gained 100 pounds in the past five years. Laboratory tests, including electrodiagnostic studies have been negative. The claimant does not exhibit any clinical signs of motor loss or loss of muscle strength (Exhibit 25F et al.). The consistency of his complaints and the level and intensity of evaluation for myalgia supports the presence of his symptoms but, again, not to the degree alleged.

(Tr. at 20.)

As stated earlier, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(d)(2) (2005).

The undersigned finds that the ALJ did consider the evidence of record from Mr. Nagye and Dr. Olsen and weighed their opinions in keeping with the applicable regulations. The record supports that the ALJ did not err in finding that Mr. Nagye's and Dr.

32

Olsen's conclusions were "not consistent with the treatment record or other medical evidence of record."  (Tr. at 21.)

Substantial evidence supports the Commissioner's decision that Claimant is not disabled. The ALJ determined that the evidence showed Claimant could not perform the full range of light work because he had additional limitations.  When these limitations were included in a hypothetical question to the vocational expert, the vocational expert identified a significant number of jobs in the national economy that Claimant can perform.  (Tr. at 22.)

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is AFFIRMED and this matter is DISMISSED from the docket of this court.

The Clerk of this court is directed to transmit this Memorandum Opinion to all counsel of record.

ENTER:

Mary E. Stanley
United States Magistrate Judge